48299. HALEY et al. v. STATE FARM MUTUAL
AUTOMOBILE INSURANCE COMPANY et al.
48300. MAGOON v. STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY et al.

HALL, Presiding Judge. In a collision between a private automobile driven by a Mrs. Childs and a pick-up truck owned by Eugene Haley and driven by his brother Frank Haley, Mary Linden Magoon was killed. Her mother, Mrs. Magoon, filed a $150,000 wrongful death suit against Mrs. Childs' administrator and Frank Haley. Great American Insurance Company filed defensive pleadings on behalf of Frank Haley under the uninsured motorist law. Additionally, plaintiff caused a copy of the complaint to be served on State Farm Mutual Automobile Insurance Company ("State Farm") which had written one insurance policy covering the pick-up truck owned by Eugene Haley, and two policies covering two vehicles owned by Frank Haley.

State Farm filed a declaratory judgment action seeking a determination of whether its policies noted above provided any coverage to the Haleys. Each party stipulated that the coverage

issue should be determined prior to trial on the merits as to liability and damages. This appeal is taken from the trial court's grant of summary judgment for State Farm on the coverage issue, and its denial of summary judgment motions made by Great American and Mrs. Magoon.

All three of the State Farm policies provided that liability coverage would not extend to an automobile "(1) While maintained or used by any person while such person is employed or otherwise engaged in an automobile business of the insured or any other person or organization. . ." The term "automobile business" was defined as follows: "Automobile Business—means the business or occupation of selling, leasing, repairing, servicing, storing or parking of vehicles or trailers."

The question of coverage turns on whether the use of Eugene Haley's pick-up truck by his brother Frank comes within these exclusion clauses.

Frank Haley at the time of the collision was the lessee and operator of a BP automobile service station where he performed typical automobile service functions. He had a grease rack and a wash rack, he fixed tires and did "just anything that is done at a service station." The call for service which took him out on the trip resulting in the collision came in during business hours, and was a request to provide road service to restart a stalled telephone company truck some distance away. The telephone company was a new customer of Frank Haley and had begun to trade with him on their usual basis of rotating their business among various service stations on a monthly basis. Frank Haley testified that he was trying to get his business started and knew the telephone company was a cash customer, so that although he was not in the road service business he nonetheless decided to make the call. He had never before offered road service. Not having a vehicle on his own premises to use, he borrowed the pick-up truck used by his brother Eugene in Eugene's service station business, and also borrowed a chain in case the telephone truck needed to be towed. Subsequently, he was not certain whether any charge had been made for the service. When he had succeeded in restarting the telephone truck, Haley began his return trip to his service station, choosing one of alternate routes of return varying in length by perhaps a half mile. Before he reached his service station the collision occurred.

On these facts we think there is no question but that the collision occurred while the truck was being used by Frank Haley while

engaged in his automobile business, and therefore the exclusion clauses of all three policies apply.

Such policy exclusions have their genesis in the assumption that an auto turned over by the owner to a service station or other auto business is more apt to be driven by an irresponsible person in ways unpredictable by the driver, who thus relinquishes control over its times and manner of operation. This potential liability is thought to be too great to impose on the insurer the obligation of covering the automobile business as an additional insured. See 13 Couch on Insurance 2d, p. 27, § 45:981; 7 Appleman, Insurance Law and Practice, p. 34, § 4372.

The variety of results reached in different jurisdictions in cases such as this, see generally Annot. 71 ALR2d 964; Annot. 47 ALR2d 556, some of which are cited by appellants, may perhaps be more comprehensible if close attention is given in each case to policy language, which is ultimately controlling.

There are two main types of "automobile business" exclusions. The "older" type, providing a narrower exclusion and correspondingly greater insurance coverage, focuses on the use to which the automobile is being put at collision-time and is phrased in terms of excluding coverage for automobiles being "used" in the automobile business. See 13 Couch on Insurance 2d, pp. 23-25, § 45:972-45:975 and cits. For example, an automobile in the hands of a shop for repairs might not always be "used" in the automobile business, if it is not an active instrumentality of that business. See Queen Ins. Co. v. Creacy (Tex. Civ. App.) 456 S. W. 2d 538, 542. But a borrowed automobile used to run an errand of picking up an extra part to be placed in stock could be "used" in the automobile business. Walker v. State Farm Mut. Auto. Ins. Co., 40 Ill. App. 2d 463 (190 NE2d 121).

The exclusion in the present appeal is the "newer" exclusion and its language quoted above focuses on the person in whose charge the automobile is at collision-time. For a comparison of the two types of exclusions see 7 Blashfield, Auto. Law and Practice (3d Ed.) p. 637, § 315.16 and 8 Id., p. 12, § 317.4. A recent Georgia case, *Northwestern Cas. Co. v. Safeco Ins. Co.,* 121 Ga. App. 209 (173 SE2d 407), denying coverage where a garage employee after dropping the owner at work was returning to the garage to service the car, was decided under the "newer" type exclusion which is broader than the old. Arguably, had the policy in that case just cited been of the older type denying coverage to

automobiles "used" in the automobile business, a different result could have been reached. An example of such a decision quite properly holding that an exclusion of the automobile "use" type did *not* apply to an automobile shop employee's driving the insured's car off to be appraised, is Pirkle v. American Liberty Ins. Co., 247 FSupp. 1018 (N.D. Ga. 1965). The fact that Pirkle was decided under a policy exclusion different from that now before us distinguishes it, contrary to the contentions of appellants.

In light of the foregoing discussion, care must be taken in applying an older decision of this court, *Public Indem. Co. v. Yearwood,* 50 Ga. App. 646 (179 SE 232) which is cited by State Farm on this appeal as authority for the proposition that Georgia construes these automobile business exclusion clauses very broadly. That is said to follow from the fact that the collision in *Yearwood* involved a chauffeur who was employed full time as a domestic servant and only did work upon insured's car as an odd job to make Christmas money. We denied coverage saying that he was a "public garage" or "automobile repair shop" within the exclusion. However, the policy in question in *Yearwood* denied extended coverage as follows: "[Coverage] shall not be available to (1) any public garage, automobile repair shop . . ." etc. This exclusion is obviously broader than either of the two usual types discussed above, and for that reason, as well as for the reason that the case as a split decision is not precedent, *Yearwood* should be taken to be an unreliable prognosticator in cases presenting narrower exclusions.

To return to the present appeal, Great American urges, in opposition to the grant of State Farm's motion, that the exclusion is only intended to apply to vehicles being used by personnel of an automobile business in connection with service or repairs to be made on *that vehicle.* This is simply incorrect. Although it is true that the only pertinent Georgia decisions have been based on such facts (and have uniformly denied coverage), viz., *Public Indem. Co. v. Yearwood,* supra; *Allstate Ins. Co. v. McBride,* 117 Ga. App. 592 (161 SE2d 415); and *Northwestern Cas. Co. v. Safeco Ins. Co.,* supra; this means only that we have not heretofore considered a case in which the vehicle in question is not itself being serviced but is allegedly being used as an instrumentality of an automobile business.

Cases presenting such facts are not unusual, and the "automobile business" exclusion is properly brought into play in determining

coverage, contrary to appellants' contentions here. E.g., Cohen v. Levine, 59 Misc. 2d 848 (300 NYS2d 393) (car driven by friend of service station operator to get spare part for repair job); Western Cas. & Sur. Co. v. Verhulst, (Mo.) 471 S. W. 2d 187 (car used to transport three persons to another city to ferry back vehicles bought by dealer).

In situations such as that present here, where an automobile is in the hands of an automobile business but not for repairs, the language of the policy excluding coverage to a vehicle "used by any person while such person is employed or otherwise engaged in an automobile business" is even more plainly applicable to the facts than in the automobile-being-serviced cases. There is no doubt that Frank Haley, as the lessee-operator of the BP service station, was generally in the "automobile business" as defined in the three policies. The only question, which presents little difficulty, is whether this road service rendered to the telephone truck was an act done by Haley "while . . . [he] is employed or otherwise engaged in an automobile business. . ."

The record is devoid of any motivation for this road service call except its relationship to furthering the service station business. Frank Haley never asserted that a decision had been made to provide the service free of charge. But even a service undertaken as non-charge accommodation to a customer may be part of the automobile business. Pollard v. Safeco Ins. Co. (Tenn. App.) 376 S. W. 2d 730 (parking lot owner's gratuitous ferrying of customer's automobile to nearby shop for tire repair). Therefore, contrary to the urgings of appellants we do not find any significant issues of fact raised by Haley's testimony that he had not charged for the service. Nor is it significant that Haley had never before made a road service trip; he had only been in business about a month. There is no plausible suggestion in the record that following the road service Haley did anything other than begin the drive back to the station.

In this case the record shows that the road service trip was undertaken out of Frank Haley's desire to provide service to the telephone company on this occasion as an incident to building a relationship with a valued new customer, and the collision occurring during such an endeavor occurred while he was engaged in the automobile business and thus falls within the policy exclusions. The court below did not err in granting summary judgment for State Farm.

*Judgment affirmed. Bell, C. J., Eberhardt, P. J., Deen, Quillian,*

*Clark and Stolz, JJ., concur. Pannell, J., concurs in the judgment. Evans, J., dissents.*
ARGUED JULY 9, 1973 — DECIDED OCTOBER 15, 1973 — REHEARING DENIED NOVEMBER 21, 1973.

*McClure, Ramsay & Struble, Robert B. Struble, John Dickerson, Eugene W. Harper, Jr., Robert D. Matthews,* for appellants.

*Heard, Leverett & Adams, E. Freeman Leverett,* for appellees.

EVANS, Judge, dissenting. The majority opinion exonerates State Farm from liability, although the record in this case clearly shows that State Farm had issued its liability insurance policy to Eugene Haley, *covering the pick-up truck that was involved in the collision,* as a result of which Mary Linden Magoon, age 18, was killed.

And although the record here clearly shows that Frank Haley, driver of the insured truck, *was not engaged in the automobile business* at the time of the homicide (being engaged in operating a service station, *where automobiles were never repaired,* but where oil was changed, gas tanks were filled, cars were lubricated and washed, flat tires were fixed, radiators were filled, etc., yet the majority opinion excuses State Farm from liability under an exclusionary clause, which asserted that liability coverage would not extend to an automobile: "(1). While maintained or used by any person while such person is *employed or otherwise engaged in an automobile business* of the insured or any other person or organization." How can the majority assert that Frank Haley at time of the collision and homicide was *engaged in an automobile business?*

*Frank Haley was not engaged in providing road service for stalled automobiles, and had never responded to a call for such until this particular day* when a request was made that he help start a stalled truck some 5 or 6 miles away.

It is difficult to understand how the majority opinion can agree to grant summary judgment in favor of State Farm in view of the above; and especially in view of the law which requires *all ambiguities, all doubts, and all inferences* to be *construed most favorably towards the party opposing the grant of summary judgment. Holland v. Sanfax Corp.,* 106 Ga. App. 1, 4 (126 SE2d 442); *McCarty v. National Life &c. Ins. Co.,* 107 Ga. App. 178, 179 (129 SE2d 408). The two foregoing opinions were written by Judge Hall, who is also the author of the majority opinion in the present case.

Frank Haley testified by deposition, and his testimony must not only be construed in the light of *Sanfax* and *McCarty,* supra, but also in the light of *Southern R. Co. v. Hobbs,* 121 Ga. 428 (1) (49 SE 294), where it is held: "The testimony of *a party* who offers himself as a witness in his own behalf is to be construed most strongly against him when it is self-contradictory, vague, or equivocal. *W. & A. R. Co. v. Evans,* 96 Ga. 481; *Freyermuth v. R. Co.,* 107 Ga. 32; *Ray v. Green,* 113 Ga. 920; *Farmer v. Davenport,* 118 Ga. 289. And he 'is not entitled to a finding in his favor if that version of his testimony the most unfavorable to him shows that the verdict should be against him.' *Southern Bank v. Goette,* 108 Ga. 796."

Let us then construe the testimony of the defendant, Frank Haley, as the law requires under the *Sanfax* case, the *McCarty* case, and the *Hobbs* case, supra, most strongly against the party testifying; and then ask ourselves as to whether there is any possible way that State Farm could have been entitled to summary judgment in this case; and if there is any possible way to construe his testimony so as to show that at the time of the homicide Frank Haley *was employed or otherwise engaged in an automobile business.*

Frank Haley testified, by depositions, as follows: That he was at that time engaged in the business of greasing cars, changing oil, washing cars, providing gasoline, fixing tires, stuff like that, just anything that is done at a service station (Tr. 199); *that he did not use any automobile in his business there at the service station; he used no vehicle whatsoever as far as giving road service or any way to use for the station.* As to whether he customarily gave road service, No, Sir (Tr. 201). This was the first time he had ever borrowed a truck on a service call; he had never before borrowed this truck for a service call; he was not in the business of making service calls on other vehicles out on the road. As to whether that was his customary business: "No, sir, I didn't give road service." (Tr. 205). He never made a charge for this particular road trip; as of this day (date of deposition) the service was done free; he never billed the telephone company for having done it (Tr. 206). He was not in the business of giving road service to vehicles; and turned a lot of people down that had called for road service; he told them he didn't give it; that he didn't have anything to make road service with; he had never given any road service on any other vehicle; this was the only time he had ever gone out to start a vehicle; his business was selling gas and oil and servicing vehicles *there at the*

*station.* As to what he depended on to make a living, he did not depend on going out and servicing vehicles on the road (Tr. 209). He went out on the road to start their vehicle *in this instance just as a favor to them,* and to his knowledge there has never been a charge made for that call (Tr. 210). As to how far it was out there, he would say four or five miles (Tr. 211). He did not come back to the station the same way he went out there (Tr. 212). He just took a notion to go back the other way (Tr. 213). The collision occurred on his return trip (Tr. 217-218).

How can the above testimony, *delivered by the party himself,* be construed in that party's motion for summary judgment, to mean that he was employed or otherwise engaged in an automobile business? The majority opinion states: "On these facts we think there is no question but that the collision occurred while the truck was being used by Frank Haley *while engaged in his automobile business,* and therefore, the exclusion clauses of all three policies apply." (Emphasis supplied.)

How grossly incorrect is this conclusion! Frank Haley *had no automobile business;* he had a service station, no part of which was devoted to repairing cars, or even to going out on the road and starting cars when stalled. He testified unequivocally in this respect, but even if he had been equivocal in his testimony, the ambiguity would have to be *construed against him.*

The majority opinion finds no Georgia authority to support its position, so it roams far, far from home in this endeavor, citing Couch, Appleman, Blashfield, ALR, and cases from Texas, Illinois, New York, Missouri and Tennessee. But it cites only three Georgia authorities, and one Federal Court case from Georgia, *not a one of which supports the position of the majority.*

The first Georgia case cited is that of *Northwestern Cas. Co. v. Safeco Ins. Co.,* 121 Ga. App. 209 (173 SE2d 407), where coverage was denied. But there the individual who caused the collision was *an employee of an automobile garage, and in business of working on and repairing automobiles.* The garage employee had carried the owner to his place of work *and was returning the car to the garage so he could work on the car,* when the collision occurred. There could be no question whatever but that the garage employee was then and there engaged in an automobile business.

The second Georgia case cited by the majority is *Public Indem. Co. v. Yearwood,* 50 Ga. App. 646 (179 SE 232). One statement therein completely demonstrates that this case does not support the majority's position, which statement is: "From the agreed

statement of facts it appears that the insured had hired Ingram to repair his automobile, giving to Ingram permission to keep the automobile overnight; *that while Ingram was operating the automobile in connection with his repair work thereon,* he ran upon and killed the plaintiff's son . . ." (Emphasis supplied.) Thus, it will be seen that the parties agreed that the car was being operated in connection with the repair work thereon.

The third Georgia case cited by the majority is that of *Allstate Ins. Co. v. McBride,* 117 Ga. App. 592 (161 SE2d 415), and one sentence from the headnote is all that need be quoted to show it helps the position of the majority not one bit, to wit: "The automobile insured by Allstate in this case was being road tested by an independent contractor *after the installation of a timing chain."* (Emphasis supplied.)

One Federal Georgia case cited by the majority is that of Pirkle v. American Liberty Ins. Co., 247 FSupp. 1018 (N. D. Ga. 1965) holding that where an employee of the automobile shop drove the insured's car off to be appraised, the exclusion clause *could not be relied on and the insurance was effective.* This case does not support the majority's position. Some of the foreign authorities (none of which bind this court) cited by the majority opinion hold that *the exclusionary clause is not applicable, and that insurance coverage is afforded,* including the case of Queen Ins. Co. v. Creacy (Tex. Civ. App.), 456 S. W. 2d 538, 542, where a car in the hands of an automobile repair shop for repairs *was not an active instrumentality of that business, and consequently was not being "used" in the automobile business.*

But not a single foreign authority cited by the majority opinion is on all-fours with the facts in the case at bar, nor even close to being on all-fours with same.

And, while, we repeat, the majority has gone far from home for authority—and found absolutely no authority by the Georgia courts to support its position—let us ask which one of the foreign cases or text-writers supports its position. Not a one of them dealt with a case of a service station operator, who did not even maintain an automobile for making road calls, and who was not in the business of making road calls, but borrowed an insured car on this particular occasion as a favor to the owner of the stalled car, and for which no charge was made. None of these authorities supports their position when applied to the facts in the case at bar.

But, there is still another reason why the majority opinion is erroneous. This court has held that even where the facts in a case

would ordinarily require application of an exclusionary clause, if the car's use is an *isolated instance,* the coverage is effective and the exclusionary clause must be disregarded. No one can deny that the use of the car in the case sub judice was an *"isolated instance."* All of the testimony shows this was the first and the only time the operator of the service station had ever left his station to go out on the roadway and render service to a stranded motorist. What is the law in such cases?

In *Buffington v. New Hampshire Fire Ins. Co.,* 104 Ga. App. 139 (121 SE2d 270), this court held: "the endorsement on an automobile liability insurance policy that 'It is understood and agreed that there are no male drivers under 25 years of age driving this car,' issued in consideration of a substantial reduction in premium, *does not relieve the insurance company of liability as to damages caused by one isolated operation of the automobile by a male under the age of 25 years."* (Emphasis supplied.) Also see discussion at page 142 where it was said that even occasional driving by a male under 25 years would not exclude liability. This opinion was concurred in by Judges Felton, Bell and the author of the opinion in the case sub judice, to wit, Judge Hall.

This court has quite recently decided the case of *U. S. Fidelity & Guaranty Co. v. Boyette,* 129 Ga. App. 843, against coverage by a vote of eight to one, with the writer being the lone dissenter. But that case is readily distinguishable from the case sub judice for the following reasons: In the *Boyette* case, the exclusion clause was much broader, in that it excluded from coverage any automobile while being used in *"Sale, repairs, servicing, storing or parking* automobiles," while the exclusion clause in the present case simply excluded from coverage automobiles while "maintained or used by any person while such person is employed or otherwise engaged in an automobile business." In the *Boyette* case the automobile was being returned to its owner by the operator of a service station, *after completion of servicing, which was in his regular and customary line of work.* But in the present case the operator of the service station *had never before at any time* gone out on the highway to start or service an automobile, and in fact, kept no truck or automobile for such purpose, which was what he did this time, travelling about four or five miles from his station in order to do so, and for which he charged nothing. Thus, the "isolated operation" principle came into play, as defined in the case of *Buffington v. New Hampshire Fire Ins. Co.,* 104 Ga. App. 139, supra, which holds that the use of an automobile in an isolated

operation will not prevent coverage under the exclusionary clause. These differences clearly make the *Boyette* case inapplicable to the case sub judice.

For all of the foregoing reasons, the exclusionary clause was not effective, coverage was afforded, and the majority opinion is in error.